Next matter is Yucis v. Sears Outlet Stores. Good morning, Your Honors. Good morning. Deborah Maines for the appellant Elizabeth Yucis. Before I begin, I would like to request three minutes for rebuttal. Okay. Thank you. Ms. Maines, correct me if I'm wrong. It seems to me the district court here relied upon two things. One, you didn't plead actual or constructive knowledge. And two, you didn't allege that you weren't able to get, as a result of the conduct, you weren't able to get a refrigerator. And you're not saying you weren't able to get a refrigerator. You're saying that the harassment that was put in the process as a way of getting the refrigerator violated the statute. That's correct, Your Honor. The case law is clear and the statute is clear. There are two ways that public accommodation discrimination can occur under the LAD. The first way is an outright denial of access because of membership in a protected classification. The second way is to engage in discrimination in the furnishing of those services. So even though one may not be denied access or denied services, one may still be discriminated against in the process of obtaining those services. This has been the law since the statute was written. And the Supreme Court made particular note of it and made that finding first in the Frannick decision and then in the Turner decision. In both of those cases, the plaintiffs were not actually denied access to the place of public accommodation. They were simply subjected to discriminatory conduct in the course of obtaining those services. In one instance, going to the lake.  In terms of actual or constructive knowledge, we don't have any published decision yet from either really from the Supreme Court in New Jersey that requires actual or constructive knowledge on the part of an owner of the discriminatory conduct of its employee. Well, there's a language in Lehman about the applicability of basic twerp principles. Does that help for you insofar as the agency principles, insofar as knowledge not being required? Because it clearly is not required in the garden variety twerp. We have an agency principle. That's correct. We don't need knowledge beforehand. That's right. And I would say that Lehman does help in that respect. And as I argued in the brief, I do think that respondeat superior and certain other precarious liability principles can and should apply in the context of public accommodation. The unpublished decision of NW required something more. Well, there's no analysis. And it's like this opinion here. NW has no analysis whatsoever. And there's nothing in the word. Notice does not appear in the statute anywhere. That's correct, Your Honor. And that's why I think that NW was wrong. And, frankly, I was disappointed when we were denied certification. But Turner and Franek are the cases you rely on, right? We rely on Franek. We rely on Turner. We rely on Thomas. But their big harasser was the owner of the establishment. That's correct, Your Honor. Not an employee. Correct. We also rely on Holmes versus Jersey City Police Department, in which Mr. Holmes, who is a transgender individual, was discriminated against during his detention by the police department after an arrest. He was at what's called the BCI, which is their processing unit where they process their SDs. And he was subjected to discriminatory conduct by officers employed by the Jersey City Police Department. And Holmes is a published decision of the appellate division, unlike NW, which is unpublished. Nowhere in Holmes does the court state that actual or constructive knowledge on the part of the police department was required for Mr. Holmes to be able to get to a trial to determine whether or not he was subjected to public accommodation discrimination. Let me ask this question. If response of the superior applies, you say it does, it applies in traditional court cases, and now we're going to apply it to a statute. So it's a little bit of a merger, right? It's a common law doctrine that we're now going to graft onto a statute. And the statute could have articulated its own defenses, but it didn't. We're potentially, you say, we can graft this common law defense or theory of vicarious liability onto a statute. Let me just start with the first question, then, under respondeat superior. Was Jaffe in the scope of his employment when he did these things? That's a good question, and I think it's a question that a jury might have to decide. But I would argue for purposes. Unless someone is employed as the sergeant at arms for purposes of Ku Klux Klan meetings, is anyone ever going to be within the scope of their employment in these kinds of cases? Well, in the employment context, there is. We're looking at public accommodations. I understand that, but we need to sort of look to employment to help inform at least the conversation about public accommodations. Because respondeat superior. I'm trying to take that away from you for a second. In terms of the purpose of the statute, if you're dealing with something which is trying to wipe out discrimination, as I said, unless someone is employed as the sergeant of arms for Ku Klux Klan meetings, is anyone ever going to be acting within the scope of their employment when they discriminate? You're right, Your Honor. And I'm sorry, I misunderstood your question the first time. That's part of my point. The LAD, the manifest intent of the LAD is to eradicate what the Supreme Court in Fuchilla called the cancer of discrimination. The statute has its own special rules of interpretation. It has to be liberally interpreted. And so to interpret it in a way that says unless the employer of the person engaging in the act of discrimination has knowledge of their conduct, or if we find that every time someone acts outside of the scope of their employment, if they engage in discriminatory conduct, then that provision of the LAD becomes, for the vast majority of places of public accommodation, null and void, the paper tiger. That's not the intent of the LAD. It also guarantees one free act of discrimination. First act, it's a freebie. Because until after the first act, the employer can't possibly have knowledge. Right. And not only that, first act for every single employee. But let's just go back to scope, right? Because scope cuts both ways, right? Because at one level you can say no employer, unless there's an extraordinary example like Judge McKee comes up with, would ever be within the scope of your employment when an employee discriminates. The flip side is if the mere act of discrimination in employment, otherwise doing your job and then engaging in some discrimination, takes you outside the scope, then there's no vicarious liability for the employer and the act would only be against the individual. So we're in this weird place where the easiest way for you to get redress against the employer is to say this was within the scope. Because if it was within the scope, then you don't just have redress. You always have redress against the individual. But now you want redress against the employer. Scope is the easiest way. And that's why some courts have, I think, very broad readings of scope. Because that state Supreme Court policy justification comes in and says, well, we aren't going to say that doing this bad act, whatever it might be, is part of your employment. We'd rather you have access to, you know, the money, the ability to pay an award that the employer has as opposed to employees. So if you lose scope, you're quite a bit down the road in terms of an action against the employer, right? Potentially, yeah. And I agree that under the L.A.C.E. Why are you conceding that? I'm sorry? Why are you conceding that? I'm not conceding. He's on his way to lunch, has nothing to do with the desire to buy a refrigerator. Sees her in the lobby of the Sears department on the way to lunch and goes, hey, hunch, come in to buy something. Maybe I can help you out. Got any pictures in your phone I could check out? Now, that's outside the scope of employment. It has nothing to do with her coming to the Sears store to buy a refrigerator. Maybe it is and maybe it isn't. Broad scope, broad definition of scope of employment. But what did he do here that had a purpose to serve the employer? A purpose to serve the employer? He was trying to make a sale. How are these crude comments that would be offensive to just about anyone, how do they serve the purpose of Sears? Those comments don't serve the purpose of Sears. But he was, for whatever reason, he's doing these things while he's trying to make a sale. He's there on the floor to talk to customers, to interact with customers, to make that sale. And by the way, we don't know yet because we haven't been provided the opportunity to engage in discovery. We don't know where he lands in the hierarchy of that store. But leaving that aside. So I guess almost any bad act would be outside the scope. Any time an employee drops a refrigerator and injures someone else in the store, you could say you weren't paid to do that. You were just paid to move it. So it seems that you get to a point where scope is delicate. But if you don't win on scope, you've got an uphill battle and your redress is only against Jaffe, not against Sears. I don't necessarily agree with that, Judge. Because if there was a finding that he's outside the scope of his employment simply because he engaged in an act of discrimination, then I think we can move to argue whether or not there are any principles such as apparent authority. If you're acting with apparent authority or an apparent design to deny or interfere with someone's use and enjoyment of a place of public accommodation, then I think there are still avenues to get to the liability of the defendant. The same way under Lehman, even though it's a different situation, Lehman allows for that. Maybe the only way you could get to it. Was this person in some way in charge of that store? Was he a supervisor? How would we know, Judge? We weren't allowed discovery. We were dismissed on 12V6. You still have a duty to investigate before you file a complaint. Precisely. There's only so much investigation we're able to do. Why would Sears volunteer to us any information about this? Do you know what sales manager means? The legend he was the sales manager. I don't know what that means. That was her understanding. Whether he said that to her, I don't know 100%. But again, discovery is what's going to get us there. I can tell you how to file a case, but it seems that no one would fault you for suing just Jaffe and then maybe learning his position in discovery in that case and then saying, oh, wow, we want to add Sears. But you skipped Jaffe. You sued just Sears. And you say, well, we didn't have any information. We had no means of learning information. Well, if you would have sued just Jaffe, you might have gone to discovery, could learn what his role was, learn how he fit into the org chart. And then, as you know, typically pleadings are liberally amended. I understand that, Your Honor. But our interpretation of the statute, which is, in our view, clear on its face, the defendant is liable for any act of an employee, manager, agent, superintendent, et cetera, et cetera. He's an employee. There's no question of that. Sears is liable for his public accommodation discrimination. Well, in terms of scope, it's also a motion to dismiss. So from seeing me, at least, whether or not he's within the scope of employment, that question is past the motion to dismiss stage. I would also argue that, too, Your Honor. The case law relied upon by the district judge, all those cases were a summary judgment disposition, not a disposition on the pleadings. Our argument here is that, of course, on these pleadings, it is possible. And, you know, who knows what happens? Maybe we lose, but we should have the opportunity to engage in discovery, litigate this case on the merits, and then get to a later decision. Okay, thank you. You reserved some time, I think, three minutes. I did, and I see my time is up. Thank you, Your Honor. Ms. Montoya? Good morning, Your Honor. May it please the Court. Concepcion Montoya for the defendant, Apolli, in this case, Sears-Alfred Storrs. Our position, Your Honor, is that the district court correctly dismissed the case based and correctly relied on the only decision out there that's on all fours with the underlying facts of this case. The legal issues are similar, the factual issues are similar, and in fact... Where's the analysis in NW that gets you a notice requirement? Factually and legally, Your Honor. In NW, the statement was made by an employee, a single isolated statement, that was not known to the employer. The issue here is employer liability. The inquiry in NW is whether the employer has actual or constructive knowledge of the propensity or past behavior of the employee to engage, to make those types of statements. That was the inquiry presented by NW, and whether the employer supported or ignored any prior discriminatory conduct, and whether the employer acted with actual or apparent design to discourage the use of the facility. That was the legal inquiry made by the appellate division. That was the way the district court analyzed the case. My question is, where in the statute does that analysis arise from? The statute in and of itself, and it's particularly the section, it's 10 colon 5, and it's section 5-12 F1. Specifically, that statute, that issue here, is silent on employer liability. All it simply holds is that it is unlawful for employer agent, supervisor owner, I'm sorry, not supervisor, owner agent, to withhold, refuse, deny, and I'm paraphrasing this, Your Honor, specifically, the use of accommodations, advantages, facilities, or privileges to any member of a protected sex. In this, in the underlying facts of this case, even the complaint itself does not allege that the behavior or the statement made by the employee attributed to her gender or sex. I am not condoning that behavior. Let me ask you a question about the complaint. Yes, Your Honor. You removed this case to federal court. Yes, Your Honor. In order to remove a case to federal court, you have to say that it's plausible. That's the standard. Correct. That the amount of controversy exceeded $75,000. Why don't you walk me through exactly how, under these facts, it's plausible that the amount of controversy in this case exceeds $75,000? Your Honor, at the time that we removed this case, this was entirely on diversity grounds, and those diversity grounds pertain to the citizenship of the plaintiff. And there's an amount of controversy. My question goes to how is it plausible that these facts, which I'm sure Sears isn't proud of in any way, shape, or form, but how is it that these facts generate an amount in controversy over $75,000? Now, plaintiffs didn't object, because that might be good news for a plaintiff. But why are we here? This does nothing. You don't have economic damages, the allegations of non-economic harm. You have any jury verdicts in New Jersey that suggest that facts like this generate $75,000 verdicts? Your Honor, at the time that we removed this case, there were ongoing negotiations already between the parties about settlement, and their demand exceeded $75,000. In addition, they were also claiming... But you weren't bound by their demand. You have to assess that. Walk me through how it's plausible. Just show me, just talk to me. I'll break it down for you. What do you think the plausible economic damages are for this? Just tell me what a number is for economic damages. Well, the value of her, obviously, her refrigerator, whatever she bought it from. Okay, so it's not the value of the refrigerator. It's the delta in the value of refrigerator. If she paid more for a refrigerator that she bought elsewhere, I'll spot you, say, $400 on that. So that's $400. You still have... What are you saying? No, no, that's the refrigerator. No, no, that's the difference. I get it, that's the delta. I wrote 1-0 versus Maytag. Well, I don't care the number. It's not going to be... Sub-zero. Yeah, I mean... Say $1,000. Okay, $1,000. It's even. You still have $74,000 to go. You've maxed out your non-economic damages. You've got to come up with a plausible theory. My brother, McKee, thinks that I shop in the wrong places, apparently. But tell me how you get to $74,000 in non-economic damages in this case, plausibly. You look at jury verdicts in New Jersey? No, Your Honor, we looked at the face of the complaint. And if you look on page 7 of the complaint, and you look at the add denim clause, you would see that they claim for compensatory damages. They claim for punitive damages, which could be also troubled in value. There's the interest. There's the cost of suit. And more importantly, there's not just the attorney's fees that's set on this complaint. It's enhanced attorney's fees. And given the course of the discovery, let's say, and even through motion practice, we tried to be engaged in mediation significantly. That amount, like being discussed, the parties were so far apart, because also the attorney's fees tend to fuel the case and propel the value of cases beyond $75,000. So your number one multiplier, what I'm hearing, and maybe it's not what you intend, but what I'm hearing is the way that you get over $75,000 is the attorney's fees. Not entirely, Your Honor. There's compensatory damages and punitive damages also being sought. What's the biggest jury verdict in New Jersey on a like-kind claim for this? Surely you've done that research, right, when you advise your client as to how much the case is worth. We value the case a certain way, and we've looked at other similar cases, Your Honor, and that's why the parties were so far apart during the negotiations. Don't go too far down that road here. Yeah, we don't want to mediate. Just answer the question. Your Honor, in our experience, given these types of cases where a lot of discrimination, against discrimination, where the sexual harassment, gender discrimination, particularly in this need-to-environment, we had good faith basis to believe that the amount of the case, well, at least reached a floor of $75,000, should possibly even exceed it. The district court didn't consider that. The district court didn't do its own plausibility analysis. It just rubber-stamped your removal, right? We did get an order, yes, Your Honor. But there's no analysis of plausibility of amount of controversy, is there? Not from what I recall from the docket. Let me ask you a question in connection with the equitable claims that's been made. They asked for a cease and desist from further activity here. First of all, is this gentleman still employed at Sears? Do you know? Your Honor, I believe that he still is, yes. And his title is sales manager, is that correct? We understand that it is, Your Honor. And what does a sales manager mean? Basically that he has reached a certain amount of level at Sears in terms of the amount of value that he sells, given how long he's been. Is he a supervisor? We do not believe he's a supervisor, Your Honor. And he's not, certainly the allegation is he's part of upper management. He is not part of upper management. But when there is a request for an equitable relief, Lehman says that that applies strict liability. So you don't get into the issues that we talked about before with your opposing counsel. Here it's just strict liability. So doesn't that mean that Sears is or could be liable for the equitable relief that Ms. Yucas seeks here? No, Your Honor, and for the following reasons. Obviously assuming that the conduct violated the New Jersey LAD. Well, it also assumes that the employee in question is a supervisor. The Lehman case, the strict liability component of the Lehman case for equitable relief applied in a supervisory sexual harassment case, correct? And in that particular manner, the offending actor was a supervisor involved in an employer-employee relationship. In this situation, the allegation is not even that the offending employee is a supervisor. The allegation is that the offending employee belongs to upper management. The complaint is completely devoid of any allegation that this particular individual supervised that particular store, was in charge of employees, or was in charge of setting policies or procedures that affected the sales force. That's not in the complaint. Judge Kugler correctly read this complaint and gave even assumed that even all of those allegations are true. We move beyond that, and now we look at whether the claim has a basis for employer liability. Your Honor, Judge Phipps correctly pointed out, the defendant in this case is not Mr. Jaffe or the offending employee. The defendant in this case is the employer. And now the question is, how do you set employer liability in a situation where the comment is one time by an employee. Well, not one time, it's three times, several times. One transaction, but by an employee. He really piled on, didn't he? I'm sorry? He really piled on, didn't he? And Your Honor. So was he in the scope of his employment? Thank you. Thank you for raising that, Judge Phipps. Now our position is that, as Your Honor correctly pointed out, these kinds of statements are not designed to benefit seers. And our position is that. The point is that here, seers would have to do something that's strictly liable because you don't get into the same types of issues that you do with regard to the non-equitable. For injunctive relief, it's a different standard. Right. Yes, it's a different standard for injunctive relief. And our position here is that, again, this is not the situation, factually, even as pled, where strict liability will apply. That is not the situation here, Your Honor. But the discussion did center around her desire to buy a washing machine, though, didn't it? I'm sorry, Your Honor? A refrigerator. The discussion centered around, arose within the context of her desire to buy a refrigerator. That's why she's there. It arose from the context of her going into the store and looking at refrigerators. But if you read the complaint very closely and you read the allegations concerning their interaction, those allegations, we would argue, are not even centered on two things. Not even centered on the sale itself because they were personal in nature. But, again, that's my point. They never will be. So you're asking us to read into the policies surrounding the law against discrimination some limitation which would basically be the exception which eats up the rule because you always have to have the discrimination or the harassment somehow pertain to the employees or the employer's job. As I said earlier, that's just not going to happen. It's just an easy, if you look at it strictly, Your Honor, from the location of where it happened, it will always be in the context of that employer's situation. The discussion, forget the location for a second. That's why I had my hypothetical about the lobby on the way to lunch. The whole discussion arose within the context of, and from her perspective, was centered around her desire to buy a refrigerator. That was her whole purpose in being there. That was the context of her remark. So within that focus, how can you say that this did not occur in the context of his employment? He's reacting to her comments because he's there to sell refrigerators. What he says there has nothing to do with selling refrigerators, but that is the parameter within which the conversation occurs. And you're saying, well, that's not within the scope of his employment. Your Honor, there's numerous case law on what the scope of employment is in any context, and even in the public accommodation context. And in that situation, the nature of the statements being made are looked at very, very closely. You're saying whenever there's a discriminatory or harassing comment, unless it somehow pertains to the job description, it's outside the scope of employment. That's what you want us to hold. It's a fact-specific inquiry, Your Honor. I'm not advocating a bright-line rule one way or the other. The LAD, I'll tell you, you just created one gigantic hole in the New Jersey policy and the New Jersey statute. You can even say within that contract, Senator Taylor, the racial epithets that were tossed around, that had nothing to do with the scope of employment. Your Honor. It didn't. Nothing to do with it. In this case, the nature of the statements, too, Your Honor, was not even – the key component of the law against discrimination with respect to public accommodation is access to the premises. In this situation, those statements did not say, unlike Turner and Frannick, there were no statements to the effect that you are not welcome here because of your gender or sex. That was not the situation. That is factually very different from this case. But in Taylor's, she got the donut, she got the coffee. She didn't pay for the donut, but she paid for the coffee. Your argument would suggest that that's the wrong result. Your Honor, in Turner, notwithstanding – Turner, I keep saying Taylor, it's Turner. It's Turner versus Frannick. In that case, notwithstanding that the plaintiff was able to avail of the goods, he was also subjected to a racial remark. And more important, the owner said, get out of here. That's the key distinction. After he got the donut and the coffee. After. But still, for public accommodation, the law says, you cannot restrict or refuse, deny, withhold access based on a protected category. Here, not only were the racial comments made, but on the basis of those racial comments, they said, get out of here. Can I ask you a question about scope again? Because I just want to tease this out. Let's just say the plaintiff and Mr. Jaffee are talking about getting a fridge, and none of these comments were made. Just none were made. It's a standard buy a fridge transaction. Do you like this one? Do you like that one? And then all of a sudden, Sears says, we won't deliver the fridge. You know, you have to haul it away yourself. And this prompts ire. And they get into an assault or a fist fight where Mr. Jaffee begins to assault the plaintiff. Would that, after they've negotiated and agreed to buy the fridge, and then the only issue is, will Sears deliver it free of charge or not? Is that in the scope of employment? Or is that fist fight because Sears isn't paying Mr. Jaffee to assault customers? Is that outside the employment as well? Well, two things, Your Honor. First is, this statute would not be implicated because in your example, it's not on the basis of any objection. I'm not saying this. I just want to know scope because this statute needs you to use, involves the implication of vicarious liability principles under New Jersey law. Correct. So take away the underlying offense. The hypothetical is designed to push you on vicarious liability principles. In that specific scenario, the argument would still be, Your Honor, that we would argue that we would not get engaging into a fist fight with a customer is not within the scope of employment. Transaction has been done, ended. We're wrapping it up. But the fist fight arose out of the non-free delivery of a refrigerator, which does make people sometimes upset when they find out that they bought a fridge and now you won't deliver it. So it feels like that's a little more in the scope. Your Honor, in that situation, I am fairly certain that there are standards and procedures here that limit employees from engaging in fist fights or altercations. I hope there's also policies and procedures that prevent this sort of conduct as well. So the presence of those is non-dispositive of the inquiry, the hypothetical I've made. Your Honor, I believe that the body of case law would respect employer liability and would respect specifically to this conduct within or without the scope of employment is well set out. It does involve a factual inquiry in many cases. Well, if it involves a factual inquiry, why are we hearing a 12B6? If that question resolves determining an issue of fact, either at a trial or on a motion for summary judgment, how can a 12B6 dismissal be appropriate? Well, Your Honor, in a 12... Say yourself, it's a factual inquiry. It wasn't even... Your Honor, the 12B6 in this case took all of the allegations as true and then raised the questions, do these facts, do these allegations, taking them all as true, rise to a plausible claim of relief or employer liability? The judge said no, not under the way it's fled, and not under the one case, and published though it may be, NW. Same analogy, same facts, same concerns, same counsel. I know NW because it's similar, but I found NW's persuasiveness, as Chief Judge Becker used to say, extraordinarily underwhelming. It just wasn't helpful. There's no analysis. Understood, Your Honor. But what plaintiff's arguments here, they have yet to propound one decision, one case that addresses the same issue presented by this one. Which issue? Because you've got... The issue of employer liability in a situation where it has no actual or constructive knowledge of the comments made by its employee. Even though that term, actual or constructive knowledge, is not within the statute. It doesn't create liability for the actions of an employee for which an employer has actual or constructive knowledge. It just says liability for the action of an employee. Yes, that's true, Your Honor. And the case law has developed interpreting, plugging those vacancies, if you will, where the statute has not addressed them. What about, you know, the Section 219 also has a broader provision for a vicarious liability. It's not just scope of employment. It says, quote, the master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless, and then in the quote there, there's four subsections. That's right, Your Honor. One is the master intended the consequences. I don't think that's pled. The master was negligent or reckless. What about that one? I don't believe that was pled either, Your Honor. What about the conduct violated the non-delegable duty of the master? That was not pled either, Your Honor. What about the last one? The servant purported to act or to speak on behalf of the principal and there was reliance on the apparent authority and he was aided in accomplishing the tort by the existence of the agent relation. That's, what do you think on that one? And in those cases, I believe, Your Honor, still you will need actual or constructive knowledge. No, it doesn't say that. I'm reading the statute right now. Servant purported to act or to speak on behalf of the principal. Just one second, Your Honor. Let me pull it. Sure. I'm on the same page. All right. So this is quoting Restatement of Agency 219. Yes. As adopted by layman. So I assume, just to be forthright with my thinking, New Jersey has adopted this Restatement of Agency, at least for torts, maybe not for the LAD. The question is, the servant purported to act or to speak on behalf of the principal, that's the first prong, and there was reliance on apparent authority or, and we don't know necessarily what this or means, if it's conjunctive of everything or just that first and, he was aided in accomplishing the tort by the existence of the agency relation. Yes, Your Honor. That one seems like maybe the allegations get there because he probably was aided by the fact that he worked for Sears and she came in as a customer and he could talk to her there. Right? Your Honor, I believe the key here also is apparent authority and if you scroll, I mean, under layman, the Lehman case addressed 292.2d specifically and said that that analysis pertains to, again, supervisory authority. That would be the hook for the apparent authority. But this, but, you know, I mean, the thought is this, that's how Lehman applied it in that case, of course, but it adopted the Restatement, which doesn't mention in subsection D, supervisory authority. It's sufficient with any apparent authority, whether or not it's apparent supervisory authority or not. So, I mean, don't we, I mean, doesn't that, doesn't the complaint kind of, even if it's not within the scope, doesn't it kind of meet that problem? Arguably, Your Honor, it can under, like, a strict reading of that, but in that situation, we also believe that even outside the scope of the authority, the nature of the statements made by this particular employee, I mean, the other side of that is that they were really not made for the purpose of, to benefit Sears. It's still the outsider. Again, I get that for the scope argument. I totally get that for the scope argument, and as you said, that's fact specific. But I guess my thought was what about, I mean, New Jersey has a pretty broad vicarious liability provision that says you can still be liable for, a master can still be liable for the torts of a servant outside the scope of their employment in these four circumstances. And I'm asking you about the fourth one. And it seems like your answer is maybe it could apply in this case, and if the answer is maybe, then the answer seems to be there's a plausible complaint. If I may conclude, Your Honor, because my time is up, but however, that being so, the courts that we submit need to also balance where to draw the line. And if we go with. Tell us where to draw the line. Our position. It's a policy issue. I'm sorry. It's not a policy question other than the policy that the New Jersey Supreme Court has set down. In this case, it's interpreting the LAD. But the LAD tells us where to draw the line. We can't on our own decide where we're going to draw the line as a matter of policy. Your Honor, my point is simply that opening up the gates and holding all employers liable for this particular section of the restatement, really this is not either the intent of what the law against discrimination is in holding an employer liable. We need to have clear standards. We need to have knowledge. But let me just tie this together. This restatement of agency is a common law doctrine. The LAD is not. It's statutory. But if we decide that New Jersey law would apply this common law doctrine of vicarious liability to this statutory cause of action, if we make that junction, then it seems that a plausible complaint has been pled against Sears based on this, at least this fourth provision of the common law provision of the restatement of agency. So isn't the real thing that you have to tell us that the restatement of agency won't apply to a statute because the statute could have created its own vicarious liability and it expressly doesn't? Isn't that your play? Your Honor, the way the complaint is pled is not. You'll never get a slower softball than the one you were just tossed. You just said the Russian Bulls, right? If I were to hit that ball thrown to me, I would say no. We can't do that for a variety of reasons. It will create so many conflicting cases, so many conflicting policy reasons, so many conflicting results from the established body of law when it comes to analysis of employer liability in situations such as these. Quick factual question before you sit down. How many sales managers were there at this particular store? Do you know? I believe there were several, Your Honor, in this particular department. Which store is this? Is this Sears? We believe it's the one in South Jersey. Thank you. And it's the Sears outlet stores. That's where all the bargains are. I told you $400 was a good number. $400 is a good number. They put the ones that don't work. I think we're both revealing we're from Ohio. We never looked at anything beyond $400 for a refrigerator. A refrigerator for less than $400? I've seen the Delta. Just to clarify, I was saying the Delta. Your Honor, just a few points. Can I ask you a quick question on the equitable claim you make? You never alleged any intent or desire of the plaintiff here to return to Sears, did you? Alleged intent. In other words, if you want to cease and desist, it means if you go back, I intend to go back, and I don't want them to act like this ever again. But there's no allegation that there was ever an intent to go back. There's no allegation there was an intent to go back. There's an allegation that, in fact, she was chilled from going back. I would submit, though, Your Honor, and I was actually in the New Jersey appellate division last week on another component of the Holmes matter, which goes directly to equitable remedies, and that was one of the questions that the court was discussing with the parties in ordering equity, which did happen in Holmes after the trial and discrimination was found by the jury to have occurred, for which Jersey City was liable. Equity wouldn't necessarily just go to the person harmed, that the court can fashion an equitable order specifically relating to the conduct of the defendant in order to, because it's a public accommodation case, protect other members of the public from having to suffer this, and so that an order of equity. This complaint was personal as to the individual, correct? It's personal as to the individual, but the LAD in and of itself, one of the reasons that the LAD has shifting attorney's fees is that individual plaintiffs, even in their own private personal matters, are essentially acting as private attorneys general. One of the fundamental underpinnings of the policy of the LAD is that every time a plaintiff who might not otherwise have the means to redress something is able to go on this fee-shifting scheme and obtain justice, they're doing it not only for themselves, but for all of the public in New Jersey. But the hand of equity should be no more, equitable relief shouldn't be any broader than is necessary to bring closure to an individual case, and it sounds like this case has already been, at least from an equitable standpoint, not a damages standpoint, which I still wonder why it's worth so much, is done. Your client's not going to go back, not going to buy another fridge from Sears. Equity is limited to, can be no more broader than is necessary to effectuate relief, and the relief that your client wants is money, apparently. Compensatory damages and non-compensatory damages. And equitable relief. But the point is, I know she wants that, but my point is this. Once she gets her compensatory and her non-compensatory damages, equitable relief isn't a substitute for those. It's when those fail for something that she still needs. And Judge Ambrose's point is she still doesn't need, she has no interest in ever returning to Sears. So she can be made whole by the substitute relief that's afforded by damages. That's the point of damages remedies, the substitute for what you otherwise would have got. But if she's not pled that she wants to go back, then the hand of equity seems to be stayed. I would disagree. I would disagree that the Supreme Court would find that, and I'm not aware of any decision from the Appellate Division or the Supreme Court in New Jersey that says that if compensatory damages are awarded under the LAD that we cannot get equity. No, I'm not saying that. I'm not saying that. That's not what I said. I hear you, but or. That's not what I said. I said without, I get you could get compensatory damages and you could say, and I want to buy a microwave at Sears. I want to buy a washing machine at Sears. I want to go back to a harassment-free Sears outlet. If you would have said that, then I don't think Judge Ambrose would have asked his question. I understand that, Your Honor. But that's not in the complaint, right? It's not in the complaint. It's not in the complaint. The complaint certainly is subject to amendment, but I would also argue that. Is that something you'd want to do if we were to go back to amend the complaint? Frankly, I don't think we need to, but certainly it's a better alternative to a dismissal under 12b-6 and an alternative that if the court really felt the facts were insufficient, should have done. I would argue that the facts are more than sufficient to plead a cause of action under a public accommodation discrimination under the LAD. But to get back to the equity question, I believe that the appellate division and the Supreme Court would both find that in order to achieve the LAD's purpose, its manifest intent, equity can and should be broader than, does this particular plaintiff get to go back to that store and not be discriminated against again? That it is just as in Mr. Holmes, and we'll find out when the opinion comes down, but I suspect that one of the things that's going to be in that opinion is that equity under the LAD is broader because we don't expect Mr. Holmes to be detained again, but we expect many other New Jerseyans to be detained by that police department. You'd either need an allegation that your client wants to go back or you need an allegation of expected repeatability, and you have neither. I have no allegation that my client wants to go back, but I think we can reasonably read any complaint of a public accommodation discrimination that other members of the public are going to access that place of public accommodation and potentially be subject to the same type of discrimination. And potential is not plausible. The standard is plausible, not potential. But I would argue that it's plausible. Usually in that case, the complaint might say, my client has no intention of going back, but we're asking for a cease and desist in connection with other customers so that this doesn't happen again, possibly. I'm not aware of any case that says that we have to articulate our request for equity with that kind of specificity, especially since we don't even get to talk to the court about equity until we first have the jury verdict. Then the question is, what is the cease and desist? That's not spelled out. A question we sort of mentioned at the outset. Why was it that Mr. Jaffe wasn't sued? I would be concerned about divulging attorney-client privilege communications and answering that question, Your Honor. I can only tell you that that's the decision that was made, but I can't comment further.